UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
SHERDIC LAW,                      :
                                  :
                    Plaintiff,    :    04 Civ. 7761 (MBM)
                                  :    OPINION AND ORDER
        -against-                 :
                                  :
JO ANNE BARNHART,                 :
Commissioner of Social            :
Security,                         :
                                  :
                    Defendant.    :
----------------------------------X

Christopher Bowes, Esq.
(Attorney for plaintiff)
Center for Disability Advocacy Rights
841 Broadway
Suite 605
New York, NY 10003
(212) 979-0505

John Gura, Esq.
(Attorney for defendant)
Assistant United States Attorney
86 Chambers Street
New York, NY 10007
(212) 637-2712

MICHAEL B. MUKASEY, U.S.D.J.

Plaintiff Sherdic Law challenges the Commissioner of Social Security's determination that he was not entitled to Social Security Income disability benefits ("SSI"), because he was not disabled. Law seeks review of the Social Security Administration's ("SSA") decision pursuant to 42 U.S.C. § 405(g) (2000). Defendant Jo Anne Barnhart has moved for a judgment on the pleadings under Fed. R. Civ. P. 12(c); Law has cross-moved for a judgment on the pleadings. For the reasons set forth below, the SSA's decision is vacated and the case is remanded for further proceedings consistent with this opinion, because the ALJ did not develop the record regarding Law's chronic leg pain, a condition for which there was ample objective medical evidence.

I.

The following facts are relevant to this appeal. Law was born on July 25, 1956. (Tr. 33)[1] He completed the eighth grade and obtained a general equivalency diploma in 2003. (Tr. 51, 192) Law has received training in automotive repairs. (Tr. 51) Between 1975 and 1990, he was employed in numerous jobs, including inventory clerk, auto mechanic, truck driver, sheet metal assembler, and porter in a warehouse. (Tr. 46, 69-76, 193)

_____

[1] Citations to "Tr." refer to the certified copy of the administrative hearing transcript and medical records provided by the Government pursuant to 42 U.S.C. § 405(g).

In 1997, Law worked again for nine months stretching and packing sheets of aluminum. (Tr. 193) Most of his previous jobs required standing; he had never held a "sitting down" job. (Tr. 192)

Law applied for disability benefits on May 12, 2002, stating he had been disabled since December 9, 1999, and he was unable to work because of lower back pain, leg pain, hepatitis C, hypertension, and hyperthyroidism. (Tr. 33-36, 45) Law's application for SSI was denied by the SSA Commissioner on September 27, 2002. (Tr. 20-24) On October 30, 2002, Law requested a hearing on his claim before an administrative law judge (the "ALJ"). (Tr. 25) His hearing was held on December 15, 2003, and, on February 26, 2004, the ALJ denied Law's claim, finding that Law "is not disabled within the meaning of the Social Security Act." (Tr. 12, 18) On April 7, 2004, Law requested review of the ALJ's decision by the SSA Appeals Council. (Tr. 4, 7) The Appeals Council denied Law's request for review on June 24, 2004. (Tr. 4)

A. Medical History

Law first complained of lower back pain on May 16, 1997, at the Bellevue Hospital emergency room. (Tr. 83-85) On March 4, 1998, Law was examined at Beth Israel Hospital for back pain lasting a month, which he claimed began when he sneezed. (Tr. 92) He refused to share his medical history and the

2

attending physician noted there was alcohol on his breath. (Tr. 92-93) He was diagnosed with musculoskeletal pain and was discharged with a prescription for Motrin. (Tr. 92-93) On October 13, 1998, Law returned to the Beth Israel Hospital Emergency Room complaining of intermittent back pain. (Tr. 92-93) The attending physician diagnosed musculoskeletal pain, prescribed Motrin, and advised Law to stop drinking alcohol. (Tr. 93)

On March 5, 1999, Law visited Jacobi Hospital for treatment of lower bank pain. (Tr. 87) It was noted that he had a history of dermatofibrosarcoma protuberans, which was previously treated and which was not considered related to his back pain. (Tr. 87) On May 5, 1999, the Jacobi Hospital Dermatology Clinic evaluated the scar that resulted from the removal of a dermatofibrosarcoma and determined that it was well-healed and was not related to Law's complaints of lower back pain. (Tr. 87)

On August 3, 1999, a neurological consultation at Beth Israel Medical Center noted that Law complained of back pain, inability to sit or lie down, and difficulty lifting objects. (Tr. 91) Law stated his medical history included a 1981 back injury, dermatofibrosarcoma protuberans and resulting laminectomy in 1985, and lower back pain radiating to his thighs for the prior five years. (Tr. 91) The neurologist determined that Law experienced "chronic low back pain – worsening" and ordered an

3

MRI of his lumbar spine. (Tr. 91)

On February 16, 2000, Law was evaluated by physical therapists at the Beth Israel Medical Center for complaints of lower back pain dating to 1985 when he had a tumor removed. (Tr. 100) He reported that walking two blocks caused him pain, as did sitting for 15 to 30 minutes. (Tr. 100) A February 16, 2000 progress note stated that a December 1999 MRI revealed a small cyst in Law's right hip that was possibly consistent with degenerative joint disease, and a possible herniated disc. (Tr. 100)

On May 25, 2000, Law was examined by Dr. Moldover at Beth Israel Medical Center and requested pain medication; it was noted that he had a mild osteoarthirtis at his right hip, a herniated disc, was "self-medicating" by snorting morphine, and was "off" his hepatitis C medications. (Tr. 101) A physical examination revealed that Law had a normal gait and station, forward flexion possible to his ankles, and decreased extension with complaints of pain. (Tr. 101) The attending physician noted that Law exhibited "definite drug seeking behavior" secondary to chronic pain. (Tr. 101) He prescribed Celebrex, drug rehabilitation, and physical therapy. (Tr. 101-02)

On November 16, 2000, Law attended physical therapy, and the physical therapy progress note stated that he complained of lower back pain over a ten-year period with progressive

worsening. (Tr. 105) It was noted also that he walked with a cane and could independently perform daily living activities. (Tr. 105) A November 29, 2000 physical therapy note stated that Law complained his back "always hurts" and some of the pain occurred while he was seated. (Tr. 106) A December 13, 2000 physical therapy note indicated that Law was not feeling well, but his range of motion was improving. (Tr. 107)

On February 5, 2002, Law was admitted to the Odyssey House Family Health Center ("OFHC") for drug rehabilitation and reported the he suffered from a herniated disc in his lower back. (Tr. 130) An examination of his back revealed a mild weakness of the right lower extremity. (Tr. 115) On March 15, 2002, Law visited Jacobi Hospital and complained of severe lower back pain. (Tr. 8) He was screened by the dermatology department to determine whether his complaints of back pain were related to his history of dermatofibrosarcoma; it was determined that the scar was well-healed and was not related to his back pain. (Tr. 88)

In April 2002, Law was seen at the OFHC for "extreme back pain" and he "stooped when ambulating in obvious distress." (Tr. 122) He was advised to rest and take Motrin; the attending nurse indicated he would be referred to an orthopedic clinic to determine if his pain was caused by a herniated disc. (Tr. 120-22) On May 31, 2002, after a consultation with the Bellevue Hospital Orthopedic Clinic, an OFHC nurse advised Law to avoid

"strenuous physical activities, heavy lifting, [and] bending" and that he take daily warm showers. (Tr. 120)

Law first complained of leg pain on February 16, 2000, when he was evaluated by physical therapists at Beth Israel Medical Center. (Tr. 100)  He was diagnosed with degenerative joint disease in the right hip, and left-side radiculopathy. (Tr. 100).  On November 16, 2000, a physical therapy note stated that Law's active range of motion for his lower extremities was full and his muscle strength was normal. (Tr. 101-02)   On February 5, 2002, Law reported to OFHC that he had "nerve damage" in both legs. (Tr. 130)  On February 8, 2002 Law was seen for severe right leg pain and it was noted he walked with a cane; he was given Motrin to take as needed. (Tr. 129) On March 20, 2002, Law was examined at OFHC for a complaint of leg pain; he was diagnosed by the attending physician with hypertension, lower back pain with radiculopathy and disc herniation to be ruled out, and hypothyroidism. (Tr. 123-24) During the visit, the physician stressed the need for weight loss and proper diet. (Tr. 123)

In addition to lower back pain and leg pain, Law suffers from a host of physical impairments.  On May 16, 1997, Law went to the Bellevue Hospital emergency room complaining of nasal congestion. (Tr. 83-85) The medical records state that Law had a history of polysubstance abuse and regular cocaine use until seven months prior to the visit. (Tr. 83) Law claimed to

suffer from nasal congestion, dizziness, occasional nausea, frequent urination, and occasional epistaxis such as nosebleeds. (Tr. 84) He was diagnosed with a viral syndrome and instructed to rest and increase fluids; he was given Sudafed, Robutussin, and Acetaminophen 325. (Tr. 85)  Additionally, Law suffered from hepatitis C, decreased vision, and syphilis. (Tr. 100)

On June 30, 1999, an ultra-sound of Law's upper abdomen was taken at Beth Israel Medical Center; it was negative for conditions including hydronephrosis and soft tissue mass. (Tr. 90)  A December 14, 2000 abdominal ultra-sound examination at Beth Israel Medical Center showed a borderline enlarged liver. (Tr. 103)  On June 20, 2001, Law sought treatment at the Beth Israel Medical Center for nausea and vomiting. (Tr. 109-10) He was diagnosed with gastroenteritis and discharged that day. (Tr. 109-10)  On November 23, 2001, a thyroid sonogram revealed a mildly enlarged nodular and hypervascular thyroid gland. (Tr. 111-12)

On February 5, 2002, Law reported to OFHC that he had a history of hyperthyroidism and occasional high blood pressure for which he took medication. (Tr. 130)  On February 6, 2002, OFHC noted Law had a history of heroin, crack cocaine, and alcohol abuse. (Tr. 114) On February 20, 2002, Law tested negative for exposure to tuberculosis. (Tr. 127) On February 26, 2002, Law complained of headaches, back pain, and pain on his right side

near the liver; he was examined by a nurse practitioner who increased his Motrin dosage, instructed him in proper body mechanics, and advised him to rest and use warm compresses. (Tr. 125-26)

In June 2002, Law was seen at OFHC for a sore throat and difficulty swallowing. (Tr. 119) In early July 2002, he had a consultation at OFHC regarding hypertension and the need to remain on a low salt diet. (Tr. 119) A July 10, 2002 progress report by Dr. Omar Burschtin of OFHC revealed that Law complained of having blood in his mouth every morning. (Tr. 118)

On July 16, 2002, Dr. Jasjit Pawha examined Law at the request of the New York State Office of Temporary Disability Assistance, which was responsible for adjudicating Law's case at the initial stage of review. (Tr. 143-48) Dr. Pawha noted Law's history of lower back pain and positive MRI in 1999, that Law claimed to experience pain during prolonged sitting and walking, that Law had a history of hepatitis C that was unsuccessfully treated, and that Law claimed he last worked in a restaurant in 1992. (Tr. 143) On examination, Law showed a normal gait and station, his lumbar flexion was limited to 70 degrees, his straight leg raising was positive at 70 degrees bilaterally, his lumbar range of motion was within normal limits, his cervical spine had a full range of motion, his joints had a full range of motion, he could make full fists with both hands, his muscle

strength was normal, his deep tendon reflexes and sensation were normal, he was able to stand on his toes but had difficulty squatting and returning to standing, and his muscle strength was normal. (Tr. 144) Dr. Pawha determined that an x-ray of Law was "consistent with degenerative disc disease at the L5-S1 level." (Tr. 145, 148) Dr. Pawha diagnosed a history of lower back pain, hypertension, hyperthyroidism, a history of drug and alcohol abuse, and a prior history of dermatofibrosarcoma. (Tr. 148) Dr. Pawha did not diagnose hepatitis C. (Tr. 148) Dr. Pawha stated that Law's prognosis was "poor" and he had a "mild restriction for sitting, standing, walking" and a "moderate restriction for lifting, carrying, pushing, and pulling." (Tr. 145) Additionally, Dr. Pawha's report notes that Law "states that he also had an EMG done which showed nerve damage." (Tr. 143) In his diagnosis, Pawha wrote "please review previous records and MRI and EMG reports." (Tr. 145)

On September 5, 2002, Law underwent a psychiatric examination by Dr. Joshua Algaze at the request of the New York State Office of Temporary Disability Assistance. (Tr. 149-50) Law reported a difficulty sleeping due to his back pain and a history of heroin, cocaine, and alcohol abuse from his teens until January 2002. (Tr. 149) Dr. Algaze found that Law appeared anxious and tense during the interview, exhibited a slow gait with a cane, made good eye contract, had clear and well

articulated speech, and showed no obsessions or phobias. (Tr. 149) Additionally, Dr. Algaze found that Law was oriented in terms of time, person, and place, was able to perform simple mathematical tests, had an intact recent and remote memory, had average intelligence and insight, and had fair judgment and insight. (Tr. 149) Dr. Algaze diagnosed Law with an adjustment reaction with depression and anxiety, a substance induced mood disorder, polysubstance abuse in remission, a personality disorder, and chronic back pain. (Tr. 150) Such conditions imposed "mild difficulties in personal, social, and occupational adjustment that impair his ability to tolerate work pressures." (Tr. 150) Further, Dr. Algaze reported Law had a "satisfactory" ability to understand, carry out, and remember simple instructions and a "satisfactory" ability to respond appropriately to supervision, co-workers, and pressures in a work setting. (Tr. 150)

On September 25, 2002, Dr. Apacible, a non-examining physician employed by the New York State Office of Temporary and Disability Assistance and under contract with the SSA, examined Law's file and indicated Law had an affective disorder, a personality disorder, and a substance abuse disorder in remission. (Tr. 165) He found Law would have "moderate" limitation in social functioning and mild problems in activities of daily living and concentration, persistence, and pace. (Tr.

167) Further, Dr. Apacible found Law would have moderate limitations in responding appropriately to changes in the workplace. (Tr. 172)

On December 10, 2003, a non-examining medical records physician at Bellevue Hospital completed a Medical Source Statement of Ability to Perform Work-Related Activities. (Tr. 176-79) The physician noted that Law was seen at Bellevue Hospital in May 1997 and June 2002, diagnosed with hepatitis C and a herniated disc in his lumbar spine, diagnosed with cirrhosis in November 2003, and began chemotherapy to treat the cirrhosis in November 2003. (Tr. 180) This physician listed Law's diagnoses as active hepatitis C, hyperthyroidism, and hypertension. (Tr. 183) He stated Law could frequently lift and carry less than ten pounds, could occasionally lift and carry up to ten pounds, could stand for at least two hours in an eight-hour work day, and could push and pull up to ten pounds. (Tr. 176-79) This physician also determined that Law's impairments did not affect his ability to sit. (Tr. 177) An additional liver biopsy was planned during a July 25, 2002 visit Law made to Bellevue Hospital, but Law failed to return for the test until April 11, 2003; the biopsy revealed Law's hepatis C had transitioned to cirrhosis. (Tr. 180)

The record contains also a medical source statement from Law's treating psychiatrist, whose name is illegible, dated

November 5, 2003. (Tr. 184-85) He stated that Law's ability to understand, remember, and carry out instructions was affected by his impairments. (Tr. 184) Also, the psychiatrist states that Law's abilities were affected by his chronic back pain and that his back condition impaired his mobility, ambulation, and most physical activities. (Tr. 185) Specifically, Law's treating psychiatrist wrote, in a different color ink from the rest of the document, that Law could not sit for more than four hours a day. (Tr. 185, 196)

B. Administrative Hearing

Law was not represented by counsel at his administrative hearing. (Tr. 12) He testified that he could not work because of pain and nerve damage to both legs, lower back pain, neck pain, and shoulder pain. (Tr. 193-94) He described the pain as constant and stated that medication numbed the pain only "a little." (Tr. 194) On a scale of one to ten, Law described his pain as seven to eight while sitting, and nine to ten when standing. (Tr. 194)

Law testified that he stopped attending physical therapy at Bellevue Hospital because the physical therapists determined it was not helping him. (Tr. 195) He explained that he began using a cane in 1997 although a physician never prescribed the device. (Tr. 195) Additionally, Law testified that he

suffered from fevers, fatigue, sores, and rashes as a result of his hepatis C medication. (Tr. 195) He said he was able to control his high blood pressure with medication. (195-96) Further, Law stated that he did not believe his psychiatric conditions prevent him from working. (Tr. 196) Law testified that his physical doctors indicated that he did not have any significant sitting limitations. (Tr. 196)

With respect to the diagnosis from his treating psychiatrist, Law admitted that he requested that the psychiatrist write that Law had a restriction on sitting even though the psychiatrist never performed a physical examination. (Tr. 197)

Law testified that he lived in an inpatient residential alcohol and substance abuse treatment program, where he was required to cook, clean, shop, or perform housework if asked and he regularly spent his days as a "light escort" taking other people to court and meetings for four hours a day. (Tr. 190, 198) After acting as a "light escort," Law would rest and attend group meetings for several hours in the evening. (Tr. 198) He has no problems using public transportation alone. (Tr. 191) Finally, Law stated that he could sit for 15 to 20 minutes at a time for a total of four hours a day, walk for 30 minutes at a time, and lift 10 pounds at a time. (Tr. 199-200)

On February 26, 2004, the ALJ denied Law's claim for

SSI. (Tr. 12-18) The ALJ found that Law was not disabled, because, although his impairments of back pain, hypertension, hepatitis, hyperthyroidism, adjustment reaction with depression and anxiety, personality disorder, and history of drug and alcohol abuse are "severe," they, either singly or in combination, "do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4." (Tr. 13, 17) The ALJ determined that Law "had hepatitis and a herniated disc in the lumbar spine at L5-S1" and that his hepatitis had transitioned to cirrhosis requiring treatment with chemotherapy. (Tr. 14) Also, the ALJ found that Law had hyperthyroidism and hypertension. (Tr. 14)

The ALJ discounted the medical record provided by Law's treating psychiatrist who said that Law could not sit for more than four hours a day, because "the claimant testified that the psychiatrist added this after the report was completed, at the claimant's urging, as the claimant disagreed with the conclusion of the medical records doctor that sitting was 'okay.' The psychiatrist never performed a physical examination of the claimant and his assessment in this regard is given little weight." (Tr. 15) Thus, the ALJ found that Law's "allegations regarding his limitations are not fully credible. . . ." (Tr. 17)

Specifically, the ALJ found that Law was not entitled to SSI because he retained the ability to do sedentary work. (Tr.

14

16) Despite his severe impairments, Law could do sedentary work, because he "has no limitations in sitting," "can stand and/or walk for at least two hours in an eight hour day," can "lift and carry less than ten pounds frequently and ten pounds occasionally," can "understand, carry out and remember simple instructions," and has "a satisfactory ability to respond appropriately to supervision, co-workers, and work pressures in a work setting." (Tr. 16)

## II.

A court reviewing a denial of Social Security benefits is permitted to set aside the Commissioner's decision if that decision is "based upon legal error or not supported by substantial evidence." Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). Substantial evidence is defined as "more then a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). To determine whether substantial evidence exists, the reviewing court must conduct its own "plenary review of the administrative record," and must be satisfied that the claimant has had a full and fair hearing, consistent with the "beneficent purposes" of the Social Security Act. Cruz v. Sullivan, 192 F.2d 8, 11 (2d

Cir. 1990) (internal quotation marks omitted).  "The Act must be
liberally applied, for it is a remedial statute intended to
include not exclude." Id.

## III.

A person is disabled under the Social Security Act if
he is unable "to engage in any substantial gainful activity by
reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not
less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Act further
states that this impairment must be "of such severity that [the
claimant] is not only unable to do his previous work but cannot,
considering his age, education, and work experience, engage in
any other kind of substantial gainful work which exists in the
national economy . . . ." Id. § 423(d)(2)(A).  In making this
determination, the SSA must consider "(1) the objective medical
facts; (2) diagnoses or medical opinions based on such facts; (3)
subjective evidence of pain or disability testified to by the
claimant or others; and (4) the claimant's educational
background, age, and work experience."  Mongeur v. Heckler, 722
F.2d 1033, 1037 (2d Cir. 1983).

The SSA employs a five-step procedure to evaluate
disability claims. See 20 C.F.R. § 404.1520.  This Circuit has

described the procedure as follows:

> First, the Commissioner determines whether
> the claimant is currently performing
> substantial gainful work; if she is, the
> claim is denied without the need to conduct
> further inquiry.  Second, if the claimant is
> not performing such work, the Commissioner
> must make a finding as to whether the
> claimant suffers from a severe impairment
> that significantly limits her physical or
> mental ability to do basic work activities;
> if no such impairment is found, the claim is
> denied at that step.  Third, if such an
> impairment is found, it is compared to the
> impairments listed in the appendix to the
> regulations; if the claimant's impairment is
> equivalent to one of the listed impairments,
> the claimant is considered disabled, and the
> claim is granted.  Fourth, if the impairment
> is not the equivalent of a listed impairment,
> the claimant must show that she cannot
> perform her former relevant work; if she does
> not make that showing, the claim is denied.
> Fifth and finally, if the claimant has shown
> that she cannot perform her former relevant
> work, the burden then shifts to the
> Commissioner to show that the claimant 'still
> retains a residual functional capacity to
> perform alternative substantial gainful work
> which exists in the national economy.'

Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1991) (quoting Bapp

v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

In this case, it is uncontested that Law has not

performed substantial gainful activity since at least 1997 and

that his impairments are severe.  The ALJ denied Law's benefits

at the fifth step of the analysis by finding that, although Law

suffered from severe impairments related to a herniated lumbar

disc, hepatitis C, hyperthyroidism, and hypertension, those

impairments are not the equivalent of a listed impairment and Law has retained a residual functional capacity to perform sedentary work.[2]  Law argues that the ALJ did not provide him with a full and fair hearing, because the ALJ failed to properly develop the administrative record by omitting the actual results of a December 1999 MRI, omitting any report related to his EMG showing nerve damage in his legs, and omitting his treatment records from Bellevue Hospital in 2002 and 2003.  Further, Law argues that, at the very least, the ALJ should have advised him that he was rejecting the opinion of his treating psychiatrist and given him an opportunity to obtain a more detailed statement from that physician.

The ALJ was not required to include in the administrative record either the actual results of the December 1999 MRI or individual treatment records from Bellevue Hospital from 2002 and 2003, and was under no duty to advise Law that he found his treating psychiatrist's report to be non-credible and allow Law to obtain another statement.  However, as discussed more fully below, the ALJ did fail to develop the administrative

---

[2] Sedentary work "involve[s] lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567.

record, and thus provide Law with a full and fair hearing, with
regard to his chronic leg pain, because the ALJ did not consider,
or even mention, that impairment in the opinion nor did he
consult or develop the related medical records.

It is the rule in the Second Circuit that "the ALJ,
unlike a judge in a trial, must himself affirmatively develop the
record" in light of "the essentially non-adversarial nature of a
benefits proceeding." Echevarria v. Secretary of HHS, 685 F.2d
751, 755 (2d Cir. 1982). This duty arises from the
Commissioner's regulatory obligations to develop a complete
medical record before making a disability determination. 20
C.F.R. §§ 404.1572(d)-(f). Where, as here, the claimant is not
represented by counsel during his hearing before the ALJ, "a duty
evolves on the hearing examiner to scrupulously and
conscientiously probe into, inquire of, and explore all the
relevant facts surrounding the alleged right or privilege." Mimms
v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984) (quoting Gold v.
Sec'y of H.E.W., 463 F.2d 38, 42 (2d Cir. 1972)).

An ALJ is required to develop a claimant's "complete
medical history for at least a twelve-month period if there was
reason to believe that the information was necessary to reach a
decision." Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999). In
developing the complete medical history, which consists of
records from the claimant's medical sources "covering at least

the 12 months preceding the month in which you file your application," 20 C.F.R. § 416.912(d)(2), the Secretary must make "every reasonable effort" to help the plaintiff obtain the required medical reports. 20 C.F.R. § 404.1512(d).

The ALJ did develop fully the record in Law's case with regard to all of his physical and mental impairments other than his chronic leg pain. First, contrary to Law's argument, the ALJ did not have to obtain the actual results of his December 1999 MRI. The ALJ relied on the medical records provided by the treating and consulting physicians, several of which referenced and interpreted the December 1999 MRI, to determine that "claimant had ... a herniated disc in the lumbar spine at L5-S1." (Tr. 14) Law argues only that the December 1999 MRI confirms that a herniated disc causes his lower back pain; the ALJ was able to come to the conclusion, which is not disputed anywhere in the administrative record, that Law suffers from a herniated disc based upon the physician evaluations. With regard to evaluating Law's back impairments, the ALJ had all of the information "necessary to reach a decision" without the inclusion of the December 1999 MRI in the administrative record.

Second, Law's argument that his "complete medical history" must contain treatment records from Bellevue Hospital from 2002 and 2003 fails. Law filed his application for SSI on May 12, 2002, and his first consultation with Bellevue Hospital

in 2002 was on May 31.  Because 20 C.F.R. § 416.912(d)(2)
requires the medical record to contain medical documentation
covering the "12 months preceding the month" in which the
application is filed, the ALJ was under no duty to obtain Law's
treatment records after May 1, 2002.  Further, the ALJ obtained a
report from Bellevue Hospital regarding Law's treatment in
December 2003 that discussed his treatment at the facility in
2002 and 2003.

        Third, the ALJ was not required to inform Law that he
did not find Law's treating psychiatrist's diagnoses that Law was
unable to sit for more than four hours to be credible or to allow
Law to obtain a more detailed statement from his treating
psychiatrist.  The ALJ must inform a <u>pro se</u> litigant if he needs
to obtain a more detailed statement from his treating physician
before rejecting that treating physician's report as conclusory.
<u>Hankerson</u> v. <u>Harris</u>, 636 F.2d 893, 896 (2d Cir. 1980) ("Before
the ALJ can reject an opinion of a pro se claimant's treating
physician because it is conclusory, basic principles of fairness
require that he inform the claimant of his proposed action and
give him an opportunity to obtain a more detailed statement.");
<u>see</u> <u>also</u> <u>Echevarria</u> v. <u>Sec'y of Health and Human Serv.</u>, 685 F.2d
751, 756 (2d Cir. 1982).  However, in the present case, the ALJ
rejected the treating psychiatrist's diagnosis not because it was
conclusory, but because it was not supported by medically

acceptable evidence as the psychiatrist had never physically examined or treated Law for physical impairments, was provided by a physician who did not specialize in or regularly treat any physical impairments, and was inconsistent with other substantial evidence in the record. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (a treating physician's report is controlling if it is "well supported by medically acceptable evidence and is not inconsistent with the other substantial evidence in the record."); 20 C.F.R. § 404.927(d)(3),(5) (greater weight is given to the opinion of a specialist about medical issues relating to his area of specialty).

   The treating psychiatrist's diagnosis that Law cannot sit for more than four hours a day, and thus is unable to perform sedentary work, is inconsistent with the reports from Bellevue Hospital and Dr. Pawha. The physician's report from Bellevue Hospital stated that Law's impairments did not affect his ability to sit. (Tr. 177) Consulting physician Dr. Pawha determined similarly that Law's impairments presented only "mild" limitations with respect to sitting. (Tr. 145) The only support in the administrative record for the treating psychiatrist's determination that Law cannot sit for more than four hours a day is Law's own testimony. Finally, the ALJ discredited the treating psychiatrist's report not because it was conclusory, but because Law had approached the psychiatrist after he initially completed

his statement and requested that the psychiatrist write that Law could not sit for more than four hours a day. (Tr. 196, 197)

However, the ALJ did fail to fully develop the record with regard to Law's leg pain.  At his administrative hearing, Law testified that he experiences chronic leg pain, and the ALJ is required to consider such subjective pain in light of the medical findings and other evidence in the record. See Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984).  If a claimant's subjective evidence of pain is accompanied by objective medical evidence, then it is entitled to great weight. Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983).  Although "disability requires more than mere inability to work without pain," Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983), "a claimant's testimony concerning his pain and suffering is not only probative on the issue of disability, but 'may serve as the basis for establishing disability, even when such pain is unaccompanied by positive clinical findings or other objective medical evidence.'" Hankerson v. Harris, 636 F.2d 893, 895 (2d Cir. 1980) (quoting Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)).

In Law's application for SSI, he stated that he suffered from chronic pain in both legs, which is "due to nerve damage[]." (Tr. 60, 67) Additionally, Dr. Pawha's report discusses Law's leg pain and recommends that his EMG report,

which Law claims shows nerve damage in his legs supporting a diagnosis of radiculopathy, be reviewed. (Tr. 143, 145; Def. Mem. of Law at 16)  On February 16, 2000, Law was evaluated at the Beth Israel Medical Center and diagnosed with  degenerative joint disease in the right hip and left-side radiculopathy. (Tr. 100). On March 20, 2002, Law was examined at OFHC for a complaint of leg pain; the attending physician identified radiculopathy to be ruled out.[3] (Tr. 123-24) Additionally, Law testified about his chronic leg pain. (Tr. 193-95)  However, the ALJ's opinion does not address, much less mention, the leg pain experienced by Law, nor did the ALJ make any effort to obtain and review Law's EMG report.  Thus, Law was not provided with a full and fair hearing because the ALJ did not fully develop the administrative record or address his chronic leg pain.

Therefore, Law's claim must be remanded to the Commissioner for reconsideration due to the ALJ's failure to develop the administrative record with respect to Law's claims of chronic leg pain.  See Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980) ("When there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have . . . remanded to the [Commissioner] for further development of the

---

[3] Rule Out in this context means a diagnosis which is possible but not established. See Miranda v. Barnhart, 2006 U.S. Dist. LEXIS 4567, at * 47 n.19 (S.D.N.Y. Jan. 12, 2006).

evidence."); <u>Fernandez</u> v. <u>Sullivan</u>, 809 F. Supp. 226, 228

(S.D.N.Y. 1992)


IV.

Finally, Law attaches to his reply memorandum updated

medical records from Bellevue Hospital, including an April 2005

MRI showing a disc herniation with nerve root compression.  This

court may not consider that medical record, because it cannot

consider evidence that was not in the administrative record at

the time the Appeals Council made its decision.  However, a

remand based on that evidence is permissible if it is material,

meaning that it is new and not merely cumulative of the evidence

already in the record and there was good cause for the failure to

submit it in a prior proceeding. <u>See</u> 42 U.S.C. § 405(g); <u>Pollard</u>

v. <u>Halter</u>, 377 F.3d 183, 193 (2d Cir. 2004); <u>Tirado</u> v. <u>Bowen</u>, 842

F.2d 595, 597 (2d Cir. 1988). "The concept of materiality

requires, in addition, a reasonable possibility that the new

evidence would have influenced the [Commissioner] to decide

claimant's application differently." <u>Pollard</u> v. <u>Halter</u>, 377 F.3d

183, 193 (2d Cir. 2004) (quoting <u>Tirado</u> v. <u>Brown</u>, 842 F.2d 595,

597 (2d Cir. 1988). Further, such evidence must be probative and

relevant to the alleged condition during the claimed period of

impairment but before the ALJ made his decision. <u>See</u> <u>id.</u>

However, evidence generated after the ALJ generated his decision

can have a bearing on the Commissioner's evaluation of the claimant's claims if, for example, it suggests that during the relevant time period, the claimant's condition was more serious then previously thought. Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004). As the ALJ has already determined based upon the administrative record that Law suffers from a herniated disc, the April 2005 MRI is not new nor would it influence the ALJ to decide Law's case differently. Thus, it is not a ground for remand.

    *                    *                    *

    For the reasons set forth above, the case is remanded to the Commissioner for further proceedings consistent with this opinion.

                                        SO ORDERED:

Dated: New York, New York          Michael B. Mukasey
       July 10, 2006               U.S. District Judge

26